(No. 4057

MARINE TRANSIT COMPANY, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 11, 1948.*

SEAGO, PIPIN, BRADLEY AND VETTER, for Claimant.

GEORGE F. BARRETT, Attorney General; WILLIAM L. MORGAN, Assistant Attorney General, for Respondent.

ECKERT, C. J.

On October 12, 1947 the claimant, Marine Transit Company, a corporation qualified and doing business in Illinois, was in the exclusive possession as charterer of the diesel towboat "A. L. Nash", which it operated in its business as a common carrier barge line on the Illinois River and Waterway. Under the terms of its charter agreement, the claimant was responsible for the maintenance and repair of the boat.

About 11:45 that morning, the towboat, with a barge, was proceeding upstream in a northerly direction. As it approached the Ninth Street Bridge at Lockport, Illinois, across the Illinois Waterway, the bridge was open. Before the towboat could complete its passage through the opening, however, the bridge swung backward toward

its closed position, striking and damaging the towboat. The bridge was maintained, operated, owned, and controlled by the respondent. The following is a statement of the accident made by Arthur G. Stander, Bridge Engineer of the Department of Public Works and Buildings:

"On October 12, 1947, at 11:40 A. M. two private cruisers and the towboat A. L. Nash with one barge of gravel, traveling upstream, signaled for an opening of the Ninth Street Bridge in Lockport. The bridge was swung upstream, that is, the east end of the bridge traveled north and came to a stop when it was parallel to the stream. The bridge tender completed the operation of opening the bridge. A submarine was docked about 1,500 feet north of the bridge on the east bank of the channel adjacent to what is known as the Butterfly Dam.

"The navigable channel at the Ninth Street Bridge is to the east of the center pier of the bridge, and due to the fact that the submarine was occupying the channel to the east of the dam it was necessary for a ship traveling upstream to cut across the channel from the east side to the west side to negotiate the Butterfly Dam. When the towboat A. L. Nash with barge of gravel was apparently clear of the bridge the bridge tender began to close the bridge, but as he had misjudged the location of the towboat, the bridge struck the after port quarters of the towboat."

On the hearing before Commissioner Blumenthal, Ben Suva, the bridge tender on duty when the accident occurred, testified that two cruisers came upstream preceding the "A. L. Nash"; that he opened the bridge to allow them to pass, and thinking the towboat would be clear, started to close the bridge; that the towboat, however, swung to the west, and foreseeing the risk of a collision, he went to the control room to shut off the power; that the wind blew the power house door shut, thereby delaying him, with the result that the bridge crashed against the boat.

On cross-examination, Suva stated that he started to close the bridge before the towboat was clear. He admitted that there was no fault on the part of the "A. L. Nash". He stated that when the bridge is swung upstream only a part of a passing tow can be seen from

inside the power control house, and to get a clear view, the bridge tender must go about ten feet outside on the roadway of the bridge on the opposite side of the control room. He further testified that his attention was diverted to the highway by the tooting of horns of automobiles waiting to cross the bridge.

The court finds that the collision of the bridge structure with claimant's towboat, and the damage thereto, was caused by the negligence of the bridge tender in charge of the bridge. He knew that the control mechanism was so housed that it might be necessary to step out on to the bridge deck to have an unobstructed view of the entire vessel passing through the open draw. He also knew, or in the exercise of ordinary care should have known, that the presence of the surfaced submarine on the east bank about 1,500 feet upstream of the bridge would necessitate a vessel travelling upstream to sheer towards the west across the channel and take such a course the towboat actually took. He should have foreseen the consequences which followed and was negligent in attempting to close the bridge before the towboat had a reasonable opportunity to pass beyond and safely clear the arc of the closing bridge structure.

Such acts of bridge tenders in operating draw bridges constitute negligence. *Lehigh Valley Trans. Co.* vs. *Chicago*, 237 Ill. 581. The fact that the bridge tender was harassed by the persistent clamor of automobile horns sounded by impatient and irritable motorists delayed for a few minutes on the highway constitutes no excuse in endangering a vessel by imprudently hastening to close the bridge. The right of a vessel properly navigating a waterway to proceed safely on its course is paramount to that of motorists on the land highway.

As a result of this negligence the deck house of the

towboat, "A. L. Nash" was badly bent and crumpled, steel plating was buckled, stanchions, deck rail, scuppers, pipes and interior sheathing and stove canopy were broken, two steel cables were broken and required renewal, and other incidental damage occurred. To repair and rehabilitate the towboat the claimant paid the following charges: To Calumet Shipyard & Drydock Company for labor and materials $1,905.67, to Upson-Walton Co. for two steel cables, $91.41, to Walker & Noonan, marine surveyors, for survey and preparation of reports, $81.00. Claimant also has established as a reasonable charge for loss of use of the towboat pending repairs the sum of $700.00, making total damages sustained by the claimant in the amount of $2,778.08.

An award is therefore made to claimant, The Marine Transit Company, in the sum of $2,500.00, the maximum which this court can allow in such cases.